**FILED**

**04/12/2021**

U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Roger A.G. Sharpe, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **JAMES MARTIN,**<br><br>                                **Plaintiff,**<br><br>**v.**<br><br>**THE DEFENDANT'S**<br>**(KROGER AND**<br>**ACCELLION)  COMPANY,**<br><br>                        Defendant. | Case No. 1:21-CV-00717-JRS-DML<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff James Martin  ("Plaintiff"), by and as Pro-se, upon personal knowledge as to himself and his own acts and experiences, and upon information and belief as to all other matters, alleges as follows:

### NATURE OF THE ACTION

1.        Plaintiff brings this ("Complaint") against Defendant The Defendant's (Kroger and Accellion)  Company ("Defendant's (Kroger and Accellion) " or "Defendant"),   and (Accellion, Inc. )  as Pro-se based on Defendant's failure to properly safeguard Defendant's (Kroger and Accellion) 's employees' sensitive human resources records, as well as Defendant's (Kroger and Accellion) 's customers' personally identifiable information ("PII"), including current and former customer's full names, residential addresses, dates of birth, phone numbers, social security numbers, and its customers' protected health information ("PHI"), including insurance information, prescription information, prescribing doctor, medication names and dates, medical history, medical diagnoses, medical treatment information, and/or clinical                                                                                          history.

12.    As a result of Defendant's (Kroger and Accellion) 's failures, Plaintiff is at a significant risk of identity theft, financial fraud, and/or other identity-theft or fraud, imminently and for years to come.

13.    Just as their PII and PHI was stolen because of its inherent value in the black market, now the inherent value of Plaintiff's' PII and PHI in the legitimate market is significantly    and    materially    decreased.

14.     On information and belief, as a result of this massive data breach, at least hundreds of thousands of Defendant's (Kroger and Accellion) 's customers and/or current and former employees nationwide have suffered exposure of PII and PHI entrusted to Defendant's (Kroger and Accellion) .

15.     In addition, based on Defendant's actions, Plaintiff have received services that were and are inferior to those for which they have contracted, and have not been provided the protection and security Defendant's (Kroger and Accellion)  promised when Plaintiff entrusted Defendant's (Kroger and Accellion)  with their PII and PHI.

16.     Plaintiff has suffered actual and imminent injuries as a direct result of the data breach. The injuries suffered by Plaintiff as a direct result of the data breach include: (a) theft of their personal data; (b) costs associated with the detection and prevention of identity theft; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate and deal with the consequences of the data breach and the stress, nuisance and annoyance of dealing with all issues resulting from the data breach; (d) the imminent injury arising from potential fraud and identity theft posed  by their personal data being placed in the   hands   of the   ill-intentioned hackers and/or criminals; (e) damages to and diminution in value of their personal data entrusted to Defendant's (Kroger and Accellion)  and with the mutual understanding that Defendant's (Kroger and Accellion)  would safeguard Plaintiff's ' personal data against theft and not allow access and misuse of their personal data by others; (f) the reasonable value of the PII entrusted to Defendant's (Kroger and Accellion) ; and (g) the continued risk to their personal data, which remains in the possession of Defendant's (Kroger and Accellion)  and which is subject to further breaches so long as Defendant's (Kroger and Accellion)   fails to undertake appropriate and adequate measures to protect Plaintiff's personal data in its possession.

Plaintiff seeks to remedy these harms and prevent their future occurrence.

on

behalf of himself whose personal data was compromised and stolen as a result of the data breach.

18.      Accordingly, Plaintiff, on behalf of himself , asserts claims for breach of implied contract, negligence, negligent entrustment, bailment, and unjust enrichment, and seeks injunctive relief, declaratory relief, monetary damages, and all other relief as authorized in equity or by law.

## THE PARTIES

### Plaintiff James Martin

19.      Plaintiff James Martin is a natural person and a resident of Shelbyville, IN. The plaintiff was born and raised in Shelbyville, Indiana and is a US citizens of this Country by birth and has been since 1967.    Plaintiff has been a pharmacy customer for many years. On March 19th, 2021, he received a letter from Defendant's (Kroger and Accellion) dated March 11th, 2021 notifying him that his PII (including PHI) had been accessed during Defendant's (Kroger and Accellion) 's data breach. Plaintiff has also sent a wire transfer through Defendant's (Kroger and Accellion) and has received money orders while at Defendant's (Kroger and Accellion) .

20.      Plaintiff entrusted his PII, PHI, and other confidential information such as contact information, health insurance policy information, prescription information, medical conditions, financial information and/or Social Security number to Defendant's (Kroger and Accellion) with the reasonable expectation and understanding that Defendant's (Kroger and Accellion) would take, at a minimum, industry-standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify him of any data security incidents related to him. Plaintiff would not have used Defendant's (Kroger and Accellion) 's services had he known that Defendant's (Kroger and Accellion) would not take reasonable steps to safeguard his sensitive PII and PHI.

21.      The letter Plaintiff received on March 19th, , 2021 informed him that the PII and

5

PHI compromised in the breach included full names, email addresses, phone numbers, home

address, dates of birth, information to process insurance claims, prescription information such as prescription numbers, prescribing doctors, medication names and dates, medical history, as well as information about certain clinical services, such as medical testing records. Before receiving this letter, Plaintiff was unaware that any breach had occurred or that his PII and PHI had been compromised.

22.    The letter offered to provide him with a limited two-year subscription to the credit monitoring service, Experian IdentityWorks. However, when Plaintiff attempted to enroll in the IdentityWorks service, the website was down. He then called the number provided in the letter and spent nearly an hour on hold without anyone ever answering the phone. After much time and effort, he was able to register for IdentityWorks. However, this purported remedy is insufficient because it does not prevent or compensate for fraud, but rather monitors for it. Furthermore, the two-year subscription is insufficient as the data included in the breach is permanently compromised. Thus, following the expiration of the two-year subscription, Plaintiff will be forced to pay out of pocket for credit monitoring, which will be necessary the rest of his life.

23.    Plaintiff has frequently checked his bank and credit accounts, including on Credit Karma, since receiving Defendant's (Kroger and Accellion) 's letter
notifying him of the data breach.

24.    Since learning about the breach, Plaintiff has suffered and continues to suffer emotional anguish and distress, including but not limited to fear and anxiety related to the breach of his sensitive personal, financial, and health information.

***Defendant
Defendant's
(Kroger        and
Accellion)***

25.    Defendant's (Kroger and Accellion) is a corporation incorporated under the laws of Ohio with its principal place of business in Cincinnati, Ohio.

7

26. Defendant's (Kroger and Accellion) provides medical services through The Little Clinic, which has more than

220 locations throughout the states of Arizona, Colorado, Georgia, Indiana, Kansas, Kentucky, Ohio, Tennessee, and Virginia.

27.     The website for The Little Clinic states that it "respects the privacy...of all people...."[1]

28.     The Little Clinic Bill of Rights and Responsibilities states that patients have the right to "be treated...in a manner that protects privacy and confidentiality of personal information;"[2]

29.     The Little Clinic requires that patients provide the following documents: copy of insurance card; proof of ID; and valid form of payment.[3] It also requires that patients provide "accurate and complete information about present complaints, past illnesses, hospitalizations, medications, and other matters related to [their] health;"[4]

30.     Defendant's (Kroger and Accellion)  also provides prescription drug services through  Defendant's (Kroger and Accellion)   Pharmacies,  of which there are over 2,200 locations nationwide.

31.     Defendant's (Kroger and Accellion)  requires its customers to provide contact information (such as name, email, and residential address), and financial information (such as Health Services Account or other credit card account information). As part and parcel of providing and/or accepting insurance, customers must also provide their sensitive health information and other personal information (such as dates of birth and Social Security numbers, that Defendant's (Kroger and Accellion) requests).

32.     Defendant's (Kroger and Accellion)  creates electronic health records of its customers  by  gathering  medical information from them. This information comes from the customers and from other individuals or

organizations, such as physicians and/or insurance plans.

------------------------------

[1] https://www.thelittleclinic.com/about-us, last accessed 3/1/2021.

[3] https://www.thelittleclinic.com/topic/patient-bill-of-rights-and-responsibilities, last accessed 3/1/2021.

[3] https://www.thelittleclinic.com/services, last accessed 3/1/2021.

[4] *Id.*

33.     Defendant's (Kroger and Accellion)  also provides money services to its customers, such as money orders, check cashing, bill pay, Coinstar, and the ability to send money.[5]

34.     Defendant's (Kroger and Accellion)  entrusted Accellion, Inc. to hold and possess Defendant's (Kroger and Accellion) 's customers' and/or employees' personal data. Accellion is a software company that purports to offer secure file- transfer to its customers. Accellion boasts the security of its "firewall" products that are intended to prevent data breaches: "When employees click the Accellion button, they know it's the safe, secure way to share sensitive information with the outside world."[6]

35.     Accellion offers a file-transfer product called "FTA." This self-described "legacy" product is 20 years old[7] and incapable of preventing modern data security threats.

36.     Starting April 30, 2021, Accellion will no longer offer its FTA product.[8]

37.     For years, Accellion has urged that its customers (such as Defendant's (Kroger and Accellion) ) migrate to its newer, more secure product "Kiteworks," which was launched roughly four years ago, yet even though advised to update its security by its own experts Defendant's (Kroger and Accellion)  still failed to maintain adequate security.[9]

### JURISDICTION & VENUE

38.     This Court has original jurisdiction the plaintiff resides in the State of Indiana where he gets his medication from Defendant's (Kroger and Accellion) s in Shelbyville, Indiana.

---

[5] https://www.Defendant's (Kroger and Accellion) .com/d/money-services, last accessed 3/1/2021.
[6] https://www.accellion.com/company/
[7] https://www.accellion.com/company/press-releases/accellion-responds-to-recent-fta-security-incident/
[8] https://www.accellion.com/sites/default/files/resources/fta-eol.pdf
[9] https://www.accellion.com/company/press-releases/accellion-responds-to-recent-fta-security-incident/;
https://www.accellion.com/sites/default/files/resources/fta-eol.pdf

39.   This Court has general personal jurisdiction over Defendant's (Kroger and Accellion)  because  Defendant's (Kroger and Accellion) 's

principal place of business is in Cincinnati, Ohio.

40.   Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) as a substantial part of the events giving rise to the claims emanated from activities within this District, and Defendant conducts substantial business in this District.

## FACTUAL ALLEGATIONS

Plaintiff brings this lawsuit his own behalf, against Defendant for its failure to protect the sensitive, confidential information of individuals in the state of Indiana —including such information as the person's name, social security number and/or driver's license or state identification number, bank account number and bank routing number, and place of employment ("Personal Information").

On or about February 1, 2021, the Office of the Indiana  State Auditor ("SAO") announced that the Personal  Information  of  approximately  1.6 million  individuals  in  the  State  of  Indiana   was compromised in a data security breach of its file transfer software vendor, Accellion (the "Data Breach").

Accellion is a software company that provides hosted file transfer services. Accellion makes and sells a file transfer service product called "FTA." However, as of late 2020, the FTA program was an outdated "legacy product" that was "nearing end-of-life"1 and was vulnerable to compromise. For several years prior to the Data Breach, Accellion had been telling its customers to "upgrade" to Accellion's new, secure file sharing program called kiteworks "to add a critical layer of security.

At the time of the Data Breach, the SAO used the legacy FTA program to transfer files.

Beginning as early as December 2020, and continuing into January 2021, attackers exploited vulnerabilities in the FTA software to gain unauthorized access to files that were being transferred using the FTA product.

The attackers were able to exploit vulnerabilities in Accellion's FTA product to access SAO files containing Personal Information. Included among the SAO files compromised in the Data Breach were claims records of over 1.6 million Indiana residents who filed unemployment insurance claims between January and December 2020.

Defendant was aware that FTA was an inadequately secure product, yet sold this vulnerable product to SAO for the transfer of Personal Information. Defendant's failure to ensure that the FTA provided adequate security protocols jeopardized the Personal Information of millions of Indiana residents, including Plaintiff and the Class, fell well short of Defendant's obligations, and also fell short of Plaintiff's and other Class members' reasonable expectations for protection of their information.

As a result of Defendant's conduct and the ensuing Data Breach, Plaintiff have suffered actual damages, and are at imminent risk of future harm, including identity theft and fraud that would result in monetary loss. Accordingly, Plaintiff brings suit, to seek redress for Defendant's unlawful conduct.

**Defendant** ACCELLION USA LLC is a Indiana limited liability company, with its main office located at 1804 Embarcadero Rd, Ste 200, Palo Alto, California 94303.

### Accellion

Accellion is software company that offers a variety of file-sharing platforms to its customers, giving its customers "a simple, secure, private way to share confidential information."3 15. Accellion describes itself as a providing a product that "prevents data breaches" and allows its users to transfer files securely: The Accellion enterprise content firewall prevents data breaches and compliance violations from third party cyber risk. CIOs and CISOs rely on the Accellion platform for complete visibility, security and control over the communication of IP, PII, PHI, and other sensitive content across email, file sharing, mobile, enterprise apps, web portals, SFTP, and

13

automated interbusiness workflows. By consolidating security across third party communication channels, the Accellion content firewall simplifies complex infrastructure and reduces costs, while improving the user experience

Accellion markets its products as a means by which to safely transfer Personal Information and sensitive content across file sharing: When employees click the Accellion button, they know it's the safe, secure way to share sensitive information with the outside world.

One of Accellion's file transfer products is Accellion FTA. "Accellion FTA helps worldwide enterprises . . . transfer large and sensitive files securely using a 100% private cloud, on-premise or hosted." But even Accellion itself recognizes that its FTA program is inadequate to keep files transfers secure, admitting that "in today's breach-filled, over-regulated world, you need even broader protection and control" than FTA can offer.

In a recent interview, Joel York, Accellion's Chief Marketing Officer, said that the Data Breach involved FTA, which he described as a 20-year-old "legacy product." Mr. York said that the company has been encouraging customers to stop using FTA, stating: "It just wasn't designed for these types of threats . . . Mr. York's recent statement was not the first of its kind. Although the FTA product was inadequately secure and subject to vulnerabilities and cyberattack threats,

Accellion had been encouraging its users to upgrade to Accellion's newer product, known as kiteworks, for several years.

Accellion's Chief Information Security Officer Frank Balonis stated: "Future exploits of [FTA], however, are a constant threat. We have encouraged all FTA customers to migrate to kiteworks for the last three years and have accelerated our FTA end-of-life plans in light of these attacks. We remain committed to assisting our FTA customers, but strongly urge them to migrate to kiteworks as soon as possible.

Despite the vulnerabilities in the FTA system, Accellion continued to provide the FTA platform to its customers, including to the SAO. And SAO continued to use Accellion's insecure product to transfer highly sensitive Personal Information.

14

**The Data Breach**

In mid-December 2020, "Accellion was made aware of a zero-day vulnerability in its legacy FTA software.

While Accellion made attempts to patch the vulnerability it initially identified, "Accellion identified additional exploits in the ensuing weeks and rapidly developed and released patches to close each vulnerability." Id. The cyberattack continued from at least midDecember and into January 2021, as cyber attackers continued to exploit vulnerabilities in the FTA product.

During the December 2020 cyber-attack, an unauthorized person was able to exploit a software vulnerability in Accellion's FTA product and gain access to files that werebeing transferred using Accellion's service. SAO was one of Accellion's customers targeted in the attack, along with 50 others.

SAO determined that data files from the Indiana  State Employment Security Department were impacted, including unemployment compensation claim information for more than 1.6 million Indiana  residents filed between January and December 2020. The unemployment compensation claim information included the person's name, social security number and/or driver's license or state identification number, bank account number and bank routing number, and place of employment.

"The compromised files may also include the personal information of other Indiana  residents who have not yet been identified but whose information was in state agency or local government files under review by the SAO."

Given the sensitive nature of the Personal Information stolen in the Data Breach—including names, Social Security numbers, taxpayer identification numbers, and bank account and routing numbers—hackers have the ability to commit identity theft, financial fraud, and other identity-related fraud against Plaintiff now and into the indefinite future.

As a result of the Data Breach, Plaintiff will have to take a variety of steps to monitor for and safeguard against identity theft, and they are at a much greater risk of suffering such identity theft. In addition, these victims of the Data Breach are at a heightened risk of potentially devastating financial identity theft.

Statistics reports, identity theft causes its victims out-of-pocket monetary losses and costs the nation's economy billions of dollars every year. In fact, many victims of the Data Breach have likely already experienced harms as a result of the Data Breach, including, but not limited to, identity theft, financial fraud, tax fraud, unauthorized lines of credit opened in their names, medical and healthcare fraud, and unauthorized access to their bank accounts. Plaintiff have spent and will spend time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit protection services, contacting their financial institutions, checking credit reports, and spending time and effort searching for unauthorized activity.

The Personal Information exposed in the Data Breach is highly coveted and valuable on underground or black markets. For example, a cyber "black market" exists in which criminals openly post and sell stolen consumer information on underground internet websites known as the "dark web"—exposing consumers to identity theft and fraud for years to come. Identity thieves can use the Personal Information to: (a) create fake credit cards that can be swiped and used to make purchases as if they were the real credit cards; (b) reproduce stolen debit cards and use them to withdraw cash from ATMs; (c) commit immigration fraud; (d) obtain a fraudulent driver's license or ID card in the victim's name; (e) obtain fraudulent government benefits; (f) file a fraudulent tax return using the victim's information; (g) commit medical and healthcare-related fraud; (h) access financial accounts and records; or (i) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

Consumers are injured every time their data is stolen and placed on the dark web—even if they have been victims of previous data breaches. Not only is the likelihood of identity theft increased, but the dark web is not like Google or eBay. It is comprised of multiple and discrete repositories of

16

stolen information. Each data breach puts victims at risk of having their information uploaded to different dark web databases and viewed and used by different criminal actors.

Exposure of this information to the wrong people can have serious consequences. Identity theft can have ripple effects, which can adversely affect the future financial trajectories of victims' lives. For example, the Identity Theft Resource Center reports that respondents to their surveys in 2013–2016 described that the identity theft they experienced affected their ability to get credit cards and obtain loans, such as student loans or mortgages.

For some victims, this could mean the difference between going to college or not, becoming a homeowner or not, or having to take out a high interest payday loan versus a lowerinterest loan.

Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007: In addition to the losses that result when identity thieves fraudulently open accounts . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration. In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair Identity Theft Resource Center, the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors

The unauthorized disclosure of Social Security Numbers can be particularly damaging because Social Security Numbers cannot easily be replaced. In order to obtain a new number, a person must prove, among other things, that he or she continues to be disadvantaged by the misuse. Thus, under current rules, no new number can be obtained until damage has been done. Furthermore, as the Social Security Administration warns: A new number probably will not solve all your problems. This is because other governmental agencies (such as the Internal Revenue Service and state motor

17

vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Also, because credit reporting companies use the number, along with other Personal Information, to identify your credit record, using a new number will not guarantee you a fresh start. This is especially true if your other Personal Information, such as your name and address, remains the same. If you receive a new Social Security Number, you will not be able to use the old number anymore. For some victims of identity theft, a new number actually creates new problems. If the old credit card information is not associated with the new number, the absence of any credit history under the new number may make it more difficult for you to get credit.

explained recently: "The ubiquity of the SSN as an identifier makes it a primary target for both hackers and identity thieves. . . . When data breaches expose SSNs, thieves can use these numbers—usually combined with other pieces of data—to impersonate individuals and apply for loans, housing, utilities, or government benefits. Additionally, this information may be sold on the black market to other hackers."

As the result of the Data Breach, Plaintiff are likely to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following: a. losing the inherent value of their Personal Information; b. costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts; c. costs associated with purchasing credit monitoring, credit freezes, and identity theft protection services; d. lowered credit scores resulting from credit inquiries following fraudulent activities; e. costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including discovering fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with the repercussions of the Data Breach; and f. the continued imminent and certainly impending injury flowing from potential fraud

18

and identify theft posed by their Personal Information being in the possession of one or many unauthorized third parties.

Even in instances where a consumer is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again, as there is typically significant time and effort associated with seeking reimbursement that is not refunded. The Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" relating to identity theft or fraud.

There may also be a significant time lag between when personal information is stolen and when it is actually misused. According to the GAO, which conducted a study regarding data breaches: [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

## COUNT I — NEGLIGENCE

90.     Plaintiff incorporates by reference all other allegations in the Complaint as if fully set forth here.

91.     Defendant's (Kroger and Accellion) owed a duty to Plaintiff and  to safeguard their sensitive PII and PHI. As part of this duty, Defendant's (Kroger and Accellion) was required to retain competent third-party data transfer companies to prevent foreseeable harm to Plaintiff and the , and therefore had a duty to take reasonable steps to safeguard sensitive PII and PHI from unauthorized release or theft.

92.     In other words, Defendant's (Kroger and Accellion) was required to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the personal, health, and financial information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

19

maintaining, and testing its security systems to ensure that Plaintiff's personal, health, and financial information in its possession was adequately secured and protected.

94.     Defendant's (Kroger and Accellion) further owed a duty to Plaintiff and to implement processes that would detect a breach of its security system in a timely manner and to timely act upon warnings and alerts.

95. There is a very close connection between Defendant's (Kroger and Accellion) 's failure to follow reasonable security standards to protect the personal data in its possession and the injury to Plaintiff When individuals have their personal information stolen, they are at substantial risk for imminent identity theft, and need to take steps to protect themselves, including, for example, buying credit monitoring services and purchasing or obtaining credit reports to protect themselves from identity theft.

96. If Defendant's (Kroger and Accellion) had taken reasonable security measures, data thieves would not have been able to take the personal information of Plaintiff and the . The policy of preventing future harm weighs in favor of finding a special relationship between Defendant's (Kroger and Accellion) and Plaintiff If companies are not held accountable for failing to take reasonable security measures to protect personal data in their possession, they will not take the steps that are necessary to protect against future security breaches.

97.     Defendant's (Kroger and Accellion) breached its duties by the conduct alleged in the Complaint by, including without limitation, failing to protect the personal, health, and financial information in its possession; failing to maintain adequate computer systems and data security practices to safeguard the personal, health, and financial information in its possession; failing to utilize adequate, updated, and secure software and related systems to protect the personal, health and financial information in its possession; failing to disclose the material fact that its computer systems and data security practices were inadequate to safeguard the personal, health, and financial data from theft; and failing to disclose in a timely and accurate manner to Plaintiff the material fact of the data breach.

20

98.  As a direct and proximate result of Defendant's (Kroger and Accellion) 's failure to exercise reasonable care and use commercially reasonable security measures, the personal data of Defendant's (Kroger and Accellion) 's employees and customers was accessed by ill-intentioned criminals who could and will use the information to

commit identity or financial fraud. Plaintiff face the imminent, certainly impending and substantially heightened risk of identity theft, fraud and further misuse of their personal data.

99.     As a proximate result of this conduct, Plaintiff suffered damage after the unauthorized data release  and will continue to suffer damages in an amount to be proven at trial. Furthermore, Plaintiff have suffered emotional distress as a result of the breach and have lost time and/or money as a result of past and continued efforts to protect their PII and prevent the unauthorized use of their PII.

### COUNT II — NEGLIGENT ENTRUSTMENT

100.     Plaintiff incorporates by reference all other allegations in the Complaint as if fully set forth here.

101.     Defendant's (Kroger and Accellion)  owed a duty to Plaintiff to adequately safeguard the PII and PHI that it required its employees and customers to provide. Part and parcel with this duty was the duty  to  only  entrust  that  data  to  third-party  vendors  with  adequate and  reasonable  security measures and systems in place to prevent the unauthorized disclosure of such data.

102.     Defendant's (Kroger and Accellion)  breached this duty by entrusting Accellion with the sensitive PII and PHI of its employees' and customers' when, as described throughout the Complaint, it knew or should have known that Accellion and Accellion's legacy FTA software was incompetent at preventing such unauthorized disclosure.

103.     As a direct and proximate result of Defendant's (Kroger and Accellion) 's failure to exercise reasonable care in whom it entrusted its employees' and customers' sensitive PII and PHI to, the personal data of Defendant's (Kroger and Accellion) 's employees and customers was accessed by ill-intentioned criminals who could and will use the information to commit identity theft or financial fraud. Plaintiff face the imminent, certainly impending and substantially heightened       risk       of       identity       theft,       fraud       and       further

22

misuse of their personal data.

104.    As a proximate result of this conduct, Plaintiff suffered damage after the unauthorized data release and will continue to suffer damages in an amount to be proven at trial. Furthermore, Plaintiff have suffered emotional distress as a result of the breach and have lost time and/or money as a result of past and continued efforts to protect their PII and prevent the unauthorized use of their PII.

## COUNT III — BAILMENT

105.    Plaintiff incorporates by reference all other allegations in the Complaint as if fully set forth here.

106.    Plaintiff delivered their personal, health, and financial information to Defendant's (Kroger and Accellion) for the exclusive purpose of obtaining services or employment.

107.    The PII and PHI is intangible personal property belonging to Plaintiff.

108.    In delivering their personal data to Defendant's (Kroger and Accellion) , Plaintiff and intended and understood that Defendant's (Kroger and Accellion) would adequately safeguard their personal data, including by exercising reasonable care in whom it provides its employees' and customers' PII and PHI to. For example, The Little Clinic Privacy Policy states that Defendant's (Kroger and Accellion) will "require our business associates to appropriately safeguard...PHI."[19]

109.    Defendant's (Kroger and Accellion) understood that it had a duty to account for, return, and/or destroy the PII

and PHI entrusted to it upon request. For example, The Little Clinic Privacy Policy states:

> You have the right to access and copy PHI about you contained in a designated record set for as long as we maintain the PHI. You also have the right to an electronic copy of that information. The designated record set usually will include prescription. [sic] Treatment, and/or billing records. To inspect or _____ copy the _____

---

[19] https://www.thelittleclinic.com/content/v2/binary/document/tlc/privacy_practices-1609869210750.pdf, last accessed 3/01/2021.

designated record set or to receive an electronic copy of PHI about you, you must send a written request.

...

You have the right to receive an accounting of the disclosures we have made of PHI about you after April 14, 2003 for most purposes other than treatment, payment, or health care operations.[20]

110.   Defendant's (Kroger and Accellion)  accepted possession of Plaintiff's personal data for the

purpose of providing employment and/or services to Plaintiff and .

111.   A bailment (or deposit) was established for the mutual benefit of the parties.

112.   During the bailment (or deposit), Defendant's (Kroger and Accellion)  owed a duty to Plaintiff and  to exercise reasonable care, diligence, and prudence in protecting their personal data as well as a duty to safeguard personal information properly and maintain reasonable security procedures and practices to protect such information. Defendant's (Kroger and Accellion)  breached this duty when it entrusted its employees' and customers' sensitive PII and PHI to Accellion through the use of Accellion's outdated  legacy FTA software, which Defendant's (Kroger and Accellion)  knew or should have known was incapable of providing reasonable security to Defendant's (Kroger and Accellion) 's data.

113.   Defendant's (Kroger and Accellion)  breached its duty of care by failing to take appropriate measures to safeguard and protect Plaintiff's personal, health, and financial information, resulting in the unlawful and unauthorized access to and misuse of Plaintiff's personal, health, and financial information.

114.   As a proximate result of this conduct, Plaintiff suffered and will continue to suffer damages in an amount to be proven at trial.

### COUNT IV — BREACH OF IMPLIED CONTRACT

115.   Plaintiff incorporates by reference all other allegations in the Complaint as if fully

---

[20] *Id.*

set forth here.

116.    Plaintiff delivered his personal, health, and financial information to

Defendant's (Kroger and Accellion) as part of the process of obtaining employment or services provided by Defendant's (Kroger and Accellion) .

117.    Plaintiff entered into implied contracts with Defendant's (Kroger and Accellion) under which Defendant's (Kroger and Accellion)  agreed to safeguard and protect such information and to timely and accurately notify Plaintiff and  that their data had been breached and compromised.

118.    In providing such data, Plaintiff entered into an implied contract with Defendant's (Kroger and Accellion)  whereby Defendant's (Kroger and Accellion)  became obligated to reasonably safeguard Plaintiff's and the other ' sensitive, non-public information.

119.    In delivering their personal data to Defendant's (Kroger and Accellion) , Plaintiff and  intended and understood that Defendant's (Kroger and Accellion)  would adequately safeguard their personal data.

120.    Plaintiff would not have entrusted their private and confidential financial, health, and personal information to Defendant's (Kroger and Accellion)  in the absence of such an implied contract.

121.    Defendant's (Kroger and Accellion)  accepted possession of Plaintiff's personal data for the

purpose of providing services or employment to Plaintiff and .

122.    Had Defendant's (Kroger and Accellion)  disclosed to Plaintiff that it would entrust such data to incompetent third-party vendors that did not have adequate computer systems and security practices to secure sensitive data, Plaintiff would not have provided their PII and PHI to Defendant's (Kroger and Accellion) .

25

123. Defendant's (Kroger and Accellion) recognized that its employees' and customers' personal data is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff.

124.    Plaintiff fully performed their obligations under the implied contracts with Defendant's (Kroger and Accellion).

125.    Defendant's (Kroger and Accellion) breached the implied contract with Plaintiff by failing to take reasonable measures to safeguard their data and instead entrusting such data to Accellion through Accellion's outdated and vulnerable legacy FTA software.

126.    As a proximate result of Defendant's conduct, Plaintiff suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT V — UNJUST ENRICHMENT

127.    Plaintiff incorporates by reference all other allegations in the Complaint as if fully set forth herein.

128.    Plaintiff and conferred a monetary benefit on Defendant's (Kroger and Accellion) in the form of monies or fees paid for services from Defendant's (Kroger and Accellion). Defendant's (Kroger and Accellion) had knowledge of this benefit when it accepted the money from Plaintiff and the.

129.    The monies or fees paid by the Plaintiff and were supposed to be used by Defendant's (Kroger and Accellion), in part, to pay for the administrative and other costs of providing reasonable data security and protection to Plaintiff and.

130.    Defendant's (Kroger and Accellion) failed to provide reasonable security, safeguards, and protections to the personal data of Plaintiff and, instead entrusting such data to Accellion through Accellion's outdated and vulnerable legacy FTA software, and as a result Plaintiff overpaid Defendant's (Kroger and Accellion) as part of the services they purchased.

131.    Defendant's (Kroger and Accellion) failed to disclose to Plaintiff that Accellion's practices and software and systems (which Defendant's (Kroger and Accellion) chose to utilize) were inadequate to safeguard Plaintiff's PII and PHI against theft.

27

132.     Under principles of equity and good conscience, Defendant's (Kroger and Accellion) should not be permitted to retain the money belonging to Plaintiff because Defendant's (Kroger and Accellion)  failed  to  provide adequate safeguards and security measures to protect Plaintiff's personal, health, and financial information that they paid for but did not receive.

133.     Defendant's (Kroger and Accellion)  wrongfully accepted and retained these benefits to the detriment of Plaintiff and .

134.     Defendant's (Kroger and Accellion) 's enrichment at the expense of Plaintiff is and  was unjust.

135.     As a result of Defendant's (Kroger and Accellion) 's wrongful conduct, as alleged above, Plaintiff is entitled  to  restitution  and  disgorgement  of  all  profits,  benefits,  and other compensation obtained by Defendant's (Kroger and Accellion) , plus attorneys' fees, costs, and interest thereon.

## RELIEF REQUESTED

Plaintiff requests that the Court:

1. Award declaratory, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and other ;

2. Award restitution and damages to Plaintiff in an amount of One Million Dollars

3. Award Plaintiff reasonable litigation expenses and fees to the extent allowed by law;

4. Award Plaintiff pre- and post-judgment interest, to the extent allowable; and

5. Award such other and further relief as equity and justice may require.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

April 6, 2021

Respectfully submitted,

James Martin
735 ½ Center Street
Shelbyville, Indiana 46176
Phone: (317) 512-6229
Email: jamesamartin3@gmail.com